The original letter, notifying Johnson that his employment was to be terminated, enumerated 29 specific instances as the basis for the proposed termination. Those instances included allegations regarding poor job performance, repeated neglect of duties, insubordination, and improper conduct. I have carefully and thoroughly studied the entire transcript of the panel's proceedings. There was undisputed testimony at the panel hearing that even after repeated oral and written reprimands regarding his unsatisfactory job performance, Johnson's poor job performance continued. Roger L. Moore, Superintendent of Education of the Colbert County Schools, testified regarding the procedure followed when parents, students, or school personnel express complaints, and that the procedure was followed when complaints were received regarding Johnson. Moore testified regarding his attendance at a meeting with Johnson and Johnson's A.E.A. representative in which employment termination was discussed, and he testified that the charges against Johnson were placed in writing and sent by certified mail to Johnson. Moore testified regarding the Board hearing and the past written reprimands in Johnson's records regarding Johnson's unsatisfactory work performance and insubordination. Moore further testified that all 29 items in the letter sent to Johnson were considered as a basis for the recommendation that Johnson's employment be terminated.
Everett Greenhill, the principal, testified at the panel hearing regarding the decline in Johnson's job performance in the nine years they had worked together, more particularly, the year preceding the decision to terminate Johnson's employment. He testified regarding his numerous discussions and attempts to assist Johnson regarding his unsatisfactory job performance, and its effect on the students, the staff, and the day-to-day operation of the school, including how the unclean conditions and the manner in which Johnson performed his duties caused disruption in the school. Greenhill testified regarding eleven recorded instances wherein he had reprimanded Johnson for inadequate job performance during the 1992-93 school term, immediately preceding his recommendation that Johnson's employment be terminated. Greenhill testified regarding numerous complaints he received about Johnson from students and staff, and his investigation into the nature of those complaints. He further testified that when he explored Johnson's complaints of problems with equipment, he often found that equipment "mechanically able to do the work," or, if not, the equipment was then repaired. He testified that the school facilities and equipment were adequate, considering their age, and that adequate cleaning would help the bathrooms and other facilities. He testified that when he confronted Johnson about his failure to properly perform his job, Johnson placed blame on the facilities, the equipment, the students, the teachers, and others. In response to the only question asked Greenhill regarding the frequency of calling for assistance to repair problems which might have interfered with the cleaning of the building, Greenhill responded, "I called the maintenance department — some days two or three times. Sometimes it may go three weeks before we need the maintenance department. It depends on what goes wrong, whether it be electrical or in the bathroom or whatever." Clyde Goode, assistant principal, testified at the panel hearing regarding the four years he had worked with Johnson. He testified that regularly, he had to talk with Johnson regarding his unsatisfactory job performance, and that although Johnson did certain parts of his job well, as a whole, his job performance was regularly unsatisfactory.
Two witnesses testified regarding the misconduct allegations. One of those witnesses was a young female student who testified that Johnson inappropriately touched her. She testified that she told her mother about it that day, and that she also wrote a statement for the school concerning that incident. On Johnson's behalf, a long-time friend testified that because Johnson had a learning disability, dyslexia, written instructions "are virtually useless." He testified that his wife interpreted written reprimands for Johnson, and that Johnson was a good worker when assisting in his television shop. The friend then stated that Johnson "was under a tremendous personal strain" around this time, and that in his opinion, perhaps Johnson *Page 279 
needed "some attention as to an evaluation of his problems. And if the man is sick, he needs something other than termination." The friend did not testify regarding any knowledge of Johnson's work performance at school.
Johnson's testimony consisted primarily of denying certain charges when questioned, and of responding that all of the other witnesses were dishonest. He testified that his job performance was the best he could do, and that, at times, he could not perform his duties because of broken equipment, no supplies, and dilapidated school facilities. He testified regarding confrontations he had with the other janitor. Johnson further testified that Greenhill "stayed on me all the time," without saying anything to the other janitor, because Johnson felt that in Greenhill's eyes, "I'm the only janitor there." He testified that Greenhill had "always given me a hard time," and that the assistant principal and the superintendent were not truthful in their testimony, because the principal gave them untrue information. Johnson could not answer why others would make false complaints about him and testify against him. He also testified that he did not have dyslexia, but that he quit school and could neither read nor write.
The record is replete with undisputed evidence concerning Johnson's reprimands and the numerous occasions he was counseled and assisted in regard to his job performance. There was undisputed testimony regarding the repeated complaints and problems with Johnson's work performance, and the numerous efforts made by the school staff to discuss these deficiencies with Johnson and to attempt to assist him in correcting the problems with his job performance. There was undisputed testimony that Johnson neglected duties, and that when confronted about his job performance, he would become defensive and upset. There was undisputed testimony regarding the many previous attempts to verbally counsel Johnson, and the written reprimands he had been issued.
It is undisputed that Johnson had been given a written warning that subsequent problems in his work performance could result in his immediate dismissal from his job, and that in spite of that drastic warning, Johnson's performance continued to be unsatisfactory, and even declined.
My review of the record discloses substantial evidence supporting the termination of Johnson's employment, and absolutely no evidence that warrants reinstating Johnson's employment. The written decision of the panel contains no findings and conclusions; however, even if I were to assume that the panel made findings and conclusions which were necessary to support its determination to reinstate Johnson, those findings and conclusions would be completely contrary to the undisputed evidence that Johnson was not satisfactorily performing his work, and that he had continued to do so after repeated notice and written warning that employment termination could result if his performance did not improve. Because I find no evidence which supports the actions of the panel to reinstate Johnson's employment, I would reverse the trial court's judgment upholding the panel's decision, and therefore, I must respectfully dissent.